FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Nov 18, 2022

SEAN F. McAVOY, CLERK

1

2

3

4

5               UNITED STATES DISTRICT COURT

6               EASTERN DISTRICT OF WASHINGTON

7   MICHAEL LADUE and AMANDA
    LADUE,                                    No.  2:21-CV-00205-MKD
8
                         Plaintiffs,          ORDER DENYING DEFENDANTS'
9                                             MOTION FOR SUMMARY
                                              JUDGMENT
        v.
10
                                              **ECF No. 67**
    KETTLE FALLS
11  INTERNATIONAL RAILWAY,
    LLC, and OMNITRAX, INC.,
12
                         Defendants.
13

14       Before the Court is Defendants' Motion for Summary Judgment, ECF No.

15  67.  On September 28, 2022, the Court heard argument on the motion.  *See* ECF

16  No. 117.  Dylan R. Williams and Scott H. Levy appeared on behalf of Plaintiffs.

17  Paul S. Stewart, Scott Cifrese, and Sabrina Affice appeared on behalf of

18  Defendants.  Plaintiffs Michael LaDue and Amanda LaDue bring negligence and

19  strict liability claims under the Federal Employers Liability Act ("FELA"), 45

20  U.S.C. §§ 51 *et seq.*, and common law.  ECF No. 62.  Defendants move for

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 1

summary judgment as to Plaintiffs' FELA claims.  For the reasons stated below,

Defendants' motion is denied.

## BACKGROUND

The undisputed facts are as follows.  Defendant Kettle Falls International

Railway, LLC ("KFR") is a Colorado company and a common carrier by railroad

engaged in commerce between the State of Washington and Canada.  ECF No. 62

at 2 ¶ 3; ECF No. 66 at 2 ¶ 3; ECF No. 111 at 1-2 ¶ 1.  Defendant OmniTRAX,

Inc. ("OmniTRAX") is a Colorado corporation that provides management services

to KFR.  ECF No. 62 at 2 ¶ 4; ECF No. 66 at 2-3 ¶ 4; ECF No. 111 at 2 ¶ 2.

In 2018, Mr. LaDue worked for All American Track, Inc. ("AAT") as a

tamper operator.  ECF No. 66 at 2 ¶ 1; ECF No. 112 at 1 ¶¶ 1-2.  On July 6, 2018,

KFR and AAT entered into a Services Agreement ("Agreement") for repair work

on two stretches of track called the San Poil Subdivision and the Kettle Falls

Subdivision.  ECF No. 105 at 4 ¶ 6; ECF No. 111 at 2 ¶ 4, 3 ¶ 10; ECF No. 112 at

1 ¶ 2.  AAT agreed to provide labor, material, and equipment for the repairs.  ECF

No. 69-1 at 2, 14; ECF No. 111 at 3 ¶ 10; ECF No. 112 at 1 ¶ 2.  KFR and

OmniTRAX own the San Poil Subdivision, and OmniTRAX was leasing the Kettle

Falls Subdivision in 2018.  ECF No. 105 at 5 ¶¶ 7-8.

On November 9, 2018, Mr. LaDue operated a tamper machine[1] for the repair project on the San Poil Subdivision.  ECF No. 105 at 7 ¶ 13; ECF No. 112 at 1 ¶ 1. After the day's work was done and night fell, Mr. LaDue drove the tamper machine southward by rail to "tie down" at a railyard known as the "Kettle Falls yard."  ECF No. 105 at 24 ¶¶ 56-57.  Unbeknownst to Mr. LaDue, several railcars were standing stationary on the track between him and his destination.  ECF No. 105 at 24 ¶ 58.  When the obstacles came into view, Mr. LaDue attempted to stop the tamper machine.  ECF No. 112 at 3 ¶ 51.  The tamper machine slowed, slid on the tracks, then collided with a railcar.  ECF No. 112 at 3-4 ¶¶ 52-53.  The collision partially ejected Mr. LaDue from the tamper machine and caused him to temporarily lose consciousness.  ECF No. 112 at 3-4 ¶¶ 52-53.

Mr. LaDue, with his spouse Ms. LaDue, filed an initial Complaint on October 5, 2020, and a First Amended Complaint on July 7, 2022.  ECF Nos. 1, 62. Defendants move for summary judgment on the First through Fifth Causes of Action of Plaintiffs' First Amended Complaint.  ECF No. 67 at 1.  The First Cause of Action alleges Negligence arising under FELA, and the Second through Fifth

---

[1] Plaintiffs provide that a "tamper" is a "motorized, rail-mounted machine used to tamp track ballast under railway tracks."  ECF No. 73 at 2 n.1.

1    Causes of Action allege Strict Liability for violations of various Federal Safety

2    Regulations, also arising under FELA.  ECF No. 62 at 6-12.

3                    **SUMMARY JUDGMENT STANDARD**

4            A district court must grant summary judgment "if the movant shows that

5    there is no genuine dispute as to any material fact and the movant is entitled to

6    judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*,

7    477 U.S. 317, 322-23 (1986); *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906

8    (9th Cir. 2019).  "A fact is 'material' only if it might affect the outcome of the

9    case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the

10   issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA,*

11   *LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (quoting *Anderson v. Liberty Lobby,*

12   *Inc.*, 477 U.S. 242, 248 (1986)).

13           The moving party "bears the initial responsibility of informing the district

14   court of the basis for its motion, and identifying those portions of 'the pleadings,

15   depositions, answers to interrogatories, and admissions on file, together with the

16   affidavits, if any,'" that demonstrate the absence of a genuine dispute of material

17   fact.  *Celotex*, 477 U.S. at 323 (quoting former Fed. R. Civ. P. 56(c)).  A moving

18   party who does not bear the burden of persuasion at trial can succeed on summary

19   judgment either by producing evidence that negates an essential element of the

20   non-moving party's claim or defense, or by showing that the non-moving party

does not have enough evidence to prove an essential element.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  A moving party who bears the burden of persuasion at trial must show that "no reasonable trier of fact could find other than for the moving party."  *Engley Diversified, Inc. v. City of Port Orchard*, 178 F. Supp. 3d 1063, 1070 (W.D. Wash. 2016) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).

Once the moving party has satisfied its burden, to survive summary judgment, the non-moving party must demonstrate by affidavits, depositions, answers to interrogatories, or admission on file "specific facts" showing that there is a genuine dispute of material fact for trial.  *Celotex*, 477 U.S. at 324.

The Court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts "are jury functions, not those of a judge . . . ."  *Anderson*, 477 U.S. at 255.  "Summary judgment is improper 'where divergent ultimate inferences may reasonably be drawn from the undisputed facts.'"  *Fresno Motors*, 771 F.3d at 1125 (quoting *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006).  "[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the court must consider

1   all evidence submitted in support of both cross-motions when separately reviewing

2   the merits of each motion.[2]  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside*

3   *Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (second alteration in original).

4                                              **DISCUSSION**

5             Defendants argue that Mr. LaDue was not their employee at the time of his

6   injury and, therefore, summary judgment is warranted on any claims arising under

7   FELA.  ECF No. 67 at 2.  FELA provides, in relevant part, that "[e]very common

8   carrier by railroad," while engaged in interstate or international commerce, "shall

9   be liable in damages to any person suffering injury while he is employed by such

10  carrier in such commerce . . . ."  45 U.S.C. § 51 (emphasis added).  "Under FELA,

11  the test of whether a company is the employer of a particular worker turns on the

12  degree of control the company exerts over the physical conduct of the worker in

13  the performance of services."  *Schmidt v. Burlington N. & Santa Fe. Ry.*, 605 F.3d

14  686, 689 (9th Cir. 2010) (citing *Kelley v. S. Pac. Co.*, 419 U.S. 318, 324 (1974)).

15  Employment status for FELA purposes is "determined by reference to common-

16  law principles."  *Kelley*, 419 U.S. at 323.

17  _____

18  [2] Mr. LaDue filed a Motion for Partial Summary Judgment, ECF No. 73, which

19  will be addressed in a separate order.  The Court has considered the materials

20  submitted in relation to Mr. LaDue's Motion in ruling on the instant motion.

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 6

Broadly, the common law definition of employee asks whether the putative employer exerts control over an employee or holds a right to control that employee. *Id*. at 324 (citing Restatement (Second) of Agency § 220(1) (Am. Law Inst. 1958)).  The United States Supreme Court, in *Kelley*, found that the Restatement factors are "helpful in applying that definition." *Id*.  The factors are:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> (d) the skill required in the particular occupation;
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
> (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job;
> (h) whether or not the work is a part of the regular business of the employer;
> (i) whether or not the parties believe they are creating the relation of master and servant; and
> (j) whether the principal is or is not in business.

Restatement (Second) of Agency § 220(2) (Am. Law Inst. 1958); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992).

The Supreme Court has recognized three methods "by which a plaintiff can establish his 'employment' with a rail carrier for FELA purposes even while he is nominally employed by another." *Kelley*, 419 U.S. at 324.  The three methods are:

> First, the employee could be serving as the borrowed servant of the railroad at the time of his injury . . . .  Second, he could be deemed to

be acting for two masters simultaneously . . . .  Finally, he could be a subservant of a company that was in turn a servant of the railroad.

*Id.*

Plaintiffs concede that Mr. LaDue was "nominally employed" by AAT at the time of his injury.  ECF No. 91 at 3; *see also* ECF No. 112 at 1 ¶ 2 ("Mr. LaDue's Employer, All-American Track . . . .").  To survive summary judgment, Plaintiffs must present adequate evidence raising a "triable issue of fact" as to whether Defendants were Mr. LaDue's employers for FELA purposes.  *Schmidt*, 605 F.3d at 688.

Plaintiffs have presented a genuine dispute as to the level of control that OmniTRAX and KFR levied over AAT's employees, and whether that level of control amounted to employment for FELA purposes.  *Kelley*, 419 U.S. at 324-25.  Plaintiffs argue that Mr. LaDue was a "borrowed servant" of OmniTRAX and KFR and was "simultaneously serving" them and AAT at the time of the incident.  ECF No. 91 at 10 (citing *Kelley*, 419 U.S. at 324-25).  Plaintiffs point to the terms of the Agreement and KFR's exercise of control over AAT employees to support this contention.

## I.      The Agreement

Under the Agreement, AAT was to supply KFR with a "5-6 man crew consisting of tools, vehicles and equipment to dismantle and re-construct approx. 3000 track feet as directed by [KFR.]"  ECF No. 69-1 at 14.  AAT was to provide a

track surfacing crew, consisting of "a Jackson 6700 Track Tamper and a Ballast Regulator, (2) Operators, and any vehicles to transport crews and equipment to the jobsite." ECF No. 69-1 at 14. Relevant to the instant analysis, the Agreement provides for certain terms as follows:

(1) KFR "may make changes, alterations, addition, or deductions" to the work to be performed," ECF No. 69-1 at 2, 14;

(2) KFR "shall serve as project engineer and make periodic inspection of the Work to verify quantity and quality of materials, quality of workmanship, adherence to schedules, and to approve the Work[,]" and that all work "is subject to final inspection and approval of the authorized representative of the Railroad," ECF No. 69-1 at 2-3;

(3) KFR "retains the right, at its sole discretion and at any time, to remove any Contractor or subcontractor employee from the Work and the premises of Railroad[,]" ECF No. 69-1 at 7; and

(4) the work is to be performed "as directed by the Railroad[.]" ECF No. 69-1 at 14.

Plaintiffs argue that "[t]he arrangement between KFR and AAT resembles a borrowing agreement for labor and equipment, rather than an agreement for the performance of services by an independent contract[or]." ECF No. 91 at 10. Indeed, AAT was to provide labor and equipment, and it would be compensated at

a daily rate for up to 10 hours per day, then hourly for any further hours worked. ECF No. 69-1 at 14. The Agreement provides that AAT was to "provide various Work on an as needed basis" at preset rates. ECF No. 69-1 at 2. The detail of the work to be done is vague and set to end upon a date certain, rather than upon the completion of work certain. ECF No. 69-1 at 14. In sum, when viewed in the light most favorable to Plaintiffs, the Agreement provides that AAT would provide KFR with workers, rather than with work. *Rookaird*, 908 F.3d at 459.

Defendants argue that the Agreement merely provides KFR with the authority to direct the repair work, inspect it for quality, and to maintain their premises, and as much "preserves the principal-independent contractor relationship, and does not grant the Railroad the right to control how AAT physically performed the details and manner of the track surfacing work." ECF No. 103 at 4-5.

"[T]he question of employment . . . [is] to be determined by reference to common-law principles" and may not be obviated by contract. *Kelley*, 419 U.S. at 323. The fact that AAT is referred to as a "Contractor" in the Agreement, and that the Agreement purports, on its face, to establish a principal-independent contractor relationship does not bar a finding that Mr. LaDue was KFR's employee. Defendants can only dispute the significance of the terms of the contract for the question of Mr. LaDue's employment status.

In *Wheeler v. Norfolk S. Ry.*, upon which Defendants rely, the Fifth Circuit found that an agreement between the plaintiff's employer and the defendant railroad lacked the supervisory authority necessary to establish that the defendant railroad "employed" the plaintiff. 6 F.4th 626, 631 (5th Cir. 2021). The Fifth Circuit explained that "the evidence could show only a retained authority by [defendant railroad employees] to order [the plaintiff or a coworker] to stop working at the railyard[.]" *Id*. The *Wheeler* court compared the facts before it to those in *Baker v. Texas & Pac. Ry. Co.*, where the defendant railroad "exercised directive control over the details of the job performed by the individual workmen, including the precise point where the mixture should be pumped, when they should move to the next point, and the consistency of the mixture." *Wheeler*, 6 F.4th at 631 (quoting *Baker*, 359 U.S. at 228-29).

KFR's authority under the Agreement falls somewhere between the supervisory authority in *Baker* and the lack thereof in *Wheeler*. Still, Plaintiffs raise enough of a factual dispute as to the significance of the authority retained by KFR in the Agreement. In particular, the vagueness of KFR's retained authority to "direct" the work, or to make "changes, alterations, addition, or deductions" to the work, and the nature of the pay-per-day arrangement, all lead to the conclusion that the fact finder, and not the Court, should decide how the Agreement weighs on the question of Mr. LaDue's employment status. ECF No. 69-1 at 1, 2, 14.

1    **II.          The Relationship Between KFR Supervisors and AAT Employees**

2        Beyond the Agreement, Plaintiffs point to deposition testimony from

3    OmniTRAX, KFR, and AAT employees.  ECF No. 91 at 2-8, 11-17.  Each

4    recounts the events leading up to Mr. LaDue's injury, which are facts that, if

5    established at trial, would support a reasonable jury finding that Mr. LaDue was,

6    for FELA purposes, Defendants' employee.

7        There is deposition testimony describing how the repair work was

8    coordinated, from OmniTRAX, KFR, and AAT supervisors, Brady Peters,

9    Winston Deason, and Fred Fernow, Jr, respectively.  Plaintiffs offer the deposition

10   testimony of Brady Peters, OmniTRAX's project manager for the San Poil

11   Subdivision repair work.  *See* ECF No. 94-5; ECF No. 70 at 1-2 ¶ 3.  Mr. Peters

12   oversaw the repair work and, on occasion, would join AAT employees in the field

13   and perform physical work.  ECF No. 70 at 1-2 ¶ 3; ECF No. 94-5 at 190:15-191:8.

14   Mr. Peters held daily job briefings for KFR and AAT employees at the job site to

15   coordinate the repair effort.  ECF No. 94-5 at 50:18-51:22, 53:20-55:3; 127:1-17.

16   Mr. Peters gave employees detailed write-ups to aid in the completion of their

17   assigned tasks, including some AAT employees.  ECF No. 94-4; ECF No. 94-5 at

18   122:11-123:24.  Fred Fernow, Jr., project manager for AAT, testified that both he

19   and Mr. Peters made the task lists; in his words: "[I]t was mainly [Mr. Peters]

20   saying, 'Hey, I need this done.'  And I would say, 'Okay, we got this crew that we

can put in there tomorrow or the next day or next week, or whatever it may be.'"

ECF No. 94-4 at 25:1-7.

Coordination of the repair work was effectuated in part through "Employees-In-Charge," or "EICs," who were experienced KFR employees entrusted with on-track safety.[3]  ECF No. 94-3 at 100:20-101:9, 138:3-7, 154:3-13; ECF No. 94-5 at 50:18-51:7, 55:1-14, 70:8-70:14.  KFR's EICs would "convey the job plan" to AAT employees.  ECF No. 94-5 at 28:18-24.  Mr. Peters described the

---

[3] Defendants' use of EICs appears to be a consequence of regulation and industry practice.  *See, e.g.*, *Mattingly v. R.J. Corman R.R. Group, LLC*, No. 19-cv-00170, 2022 WL 3356011, at *3, *14 (E.D. Ky. Aug. 12, 2022) ("The presence of an EIC is common on similar jobs and necessary under federal regulations"); *Thomas v. Union Pac. R.R. Co.*, No. 16-cv-04052, 2018 WL 3747467, at *5 (W.D. Ark. Aug. 7, 2018); *Royal v. Mo. & N. Ark. R.R. Co., Inc.*, No. 15-cv-04008, 2016 WL 4426411, at *6 (W.D. Ark. Aug. 17, 2016); *see also* 49 C.F.R. § 214.7 (definition of a "roadway worker in charge").  The Court's consideration of KFR's EICs should not be read to support FELA liability where railroads employ EICs to manage or supervise contractors for safety purposes.  It is the actual level of control exerted by those EICs, or any other railroad employee, which can implicate employment status.

EIC's role as "administrative[,]" and explained that "EICs were tasked with protecting the track that the contractors were working on by, for example, obtaining track warrants and setting work limits."  ECF No. 70 at 5 ¶ 16.  From Mr. LaDue's perspective, EICs "coordinate[d] train movement, work groups, and work limits."  ECF No. 72-1 at 68:1-18.  Winston Deason, general manager for KFR, described EICs as "in charge of all the people working in the track and in the parameters or the lengths of the track."  ECF No. 94-7 at 56.

At various times, OmniTRAX and KFR employees influenced the manner in which AAT employees performed their work.  Mr. Peters, on at least one occasion, discussed Mr. LaDue's performance with an AAT supervisor, expressing that Mr. LaDue needed to "calm down some" and "slow down just a little bit . . . in his actions."  ECF No. 94-5 at 257:24-258:5.  Mr. Deason regularly traversed the railroad to observe the work being done.  ECF No. 94-5 at 191:13-192:5.  Earlier on the day of Mr. LaDue's injury, Mr. Deason met Mr. LaDue out in the field to deliver him a gift certificate as a token of appreciation for good work and good communication.  ECF No. 94-7 at 92:12-93:13; ECF No. 104-2 at 131:21-132:9.  Mr. LaDue observed an OmniTRAX supervisor named Tony Simoes "operate AAT equipment . . . , critique the work of AAT employees, offer instruction as to

how to perform the work, and direct how rock or ballast as to be placed along the track." ECF No. 93 at 1-2 ¶ 3.[4]

Mr. Fernow testified as to AAT's independence. He explained that "the railroad tells us what we have to get done, what they want us to do. They don't tell us how to do our job, they tell us what they need done." ECF No. 94-4 at 25:10-13. Mr. Fernow testified that KFR "would have their guys there to oversee, to make sure we're doing what they wanted done . . . . [I]t's not up to them to tell my guys to go do anything. That's up to All American Track. . . . All American

---

[4] Defendants urge the Court to disregard this assertion as "self-serving, conclusory" and insufficiently detailed. ECF No. 103 at 12. The authority that Defendants rely upon, in contrast, suggest that the Court should not dismiss Mr. LaDue's declaration. *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) ("Although the source of the evidence may have some bearing on its credibility and on the weight it may be given by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature."). The Court should disregard a self-serving declaration that is merely conclusory. *Id.* at 497-98. However, Mr. LaDue's declaration sets forth facts that he personally observed. The reliability of his observations may be challenged at trial.

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 15

Track, we're just contractors.  We sub out to the railroad."  ECF No. 94-4 at 56:11-17.  Mr. Fernow explained that "[o]ver the course of the Project, [Mr.] Ladue's direct chain of command consisted entirely of AAT employees.  KFR controlled the track AAT was working on."  ECF No. 71 at 4 ¶ 20.

Despite Mr. Fernow's testimony, there is evidence of KFR and OmniTRAX employees exerting direct control over AAT employees.  Mr. Fernow detailed an incident that occurred about two weeks prior to Mr. LaDue's injury where Mr. Peters directed AAT employees to arrive to work at around 5:00 a.m., before sunrise.  ECF No. 94-4 at 64:6-65:21.  Mr. Fernow was surprised to learn that AAT employees were traveling on the track before sunrise because "unless it's an emergency, [he] do[es]n't like [AAT's] guys traveling in the dark; [t]here's too many things that can go wrong."  ECF No. 94-4 at 65:6-10.  The following morning, Mr. Fernow expressed his concern to Mr. Brady and the rest of the crew, and said, "I don't want these guys working after dark . . . unless it's an emergency and you go through me on it."  ECF No. 94-4 at 65:16-19.  Mr. Fernow stated that following the conversation, Mr. Peters did not adhere to his instruction.  ECF No. 94-4 at 74:7-10.

Further, the facts surrounding Mr. LaDue's injury tend to indicate that KFR exerted some control over him.  Wyatt Willey was the KFR EIC overseeing Mr. LaDue that day.  ECF No. 94-2 at 2-4; ECF No. 94-3 at 100:20-23.  Mr. Peters

provided workers with a task sheet for that day instructing that "NO EQUIPMENT IS TO BE TIED DOWN ANYWHERE BUT SOUTH END OF BOYDS[.]" ECF No. 94-1 at 2; *see also* ECF No. 87 at 2 ¶ 4; ECF No. 75-5 at 160:3-15. Mr. Peters indicated that this instruction should have been given to Mr. LaDue and Mr. Willey in the morning briefing. ECF No. 87 at 2-3 ¶¶ 4-6. However, both Mr. Peters and Mr. Willey stated their memory was unclear as to whether this actually happened. ECF No. 75-5 at 129:3-12; ECF No. 75-6 at 25:3-14. To the contrary, Mr. LaDue and Mr. Willey testified that, on the morning of the incident, Mr. Peters instructed them to tie down at the Kettle Falls yard, although their memory was also hazy. ECF No. 75-1 at 129:16-24; ECF No. 75-6 at 35. Regardless, after the work for the day was complete, Mr. LaDue radioed Mr. Willey and asked to tie down at the Kettle Falls yard. ECF No. 94-3 at 137:9-15, 154:3-15; ECF No. 75-6 at 16:24-17:17. Mr. Ladue asked Mr. Willey, because he needed the KFR EIC's permission to go to the Kettle Falls yard. ECF No. 94-3 at 154:14-15.

There are conflicting accounts as to whether Mr. Willey then called Mr. Peters to ask if Mr. LaDue could take the tamper to Kettle Falls yard. *Compare* ECF No. 75-6 at 27:13-21 (Q: ". . . at that point, you told Mr. Ladue to go back to the yard?" Mr. Willey: "Correct . . . After Brady gave me permission.") *with* ECF No. 87 at 4 ¶ 9 (Mr. Peters: "I understand that Willey claims that . . . prior to Willey authorizing Ladue to tram to the KFR yard, he called me and asked

my permission for this movement, which, according to Willey, I granted.  This is not true.").  Regardless, KFR appears to have had the authority to direct where Mr. LaDue was to tie down and, through Mr. Willey, did direct Mr. LaDue to the Kettle Falls yard.  ECF No. 94-3 at 154:3-15.  Mr. LaDue proceeded to the Kettle Falls yard in the dark, despite prior admonition from Mr. Fernow that AAT employees should not be traveling in the dark.  ECF No. 94-3 at 154:17-19.

In sum, the above facts raise a genuine dispute as to KFR and OmniTRAX control over AAT employees, including Mr. LaDue, and whether that control amounts to "employment" for FELA purposes.  *Schmidt*, 605 F.3d at 689.

Defendants compare this case to *Royal v. Mo. & N. Ark. R.R. Co., Inc.*, wherein the Eighth Circuit affirmed summary judgment for defendant on the issue of employee status.  857 F.3d 759, 763 (8th Cir. 2017).  The Eighth Circuit found dispositive that the plaintiff's non-railroad employer "hired him, trained him, . . . sent him to do maintenance work on railroads . . . , was responsible for [his] compensation and maintained sole authority to discipline or fire him . . . [,] provided all safety training and equipment instruction to [him] and furnished all his personal protective and service equipment."  *Id.*  The Eighth Circuit was not persuaded by the plaintiff's proffer that the defendant railroad's employees "often told him to 'hurry up,'" that he was required to abide by the defendant railroad's safety guidelines, that its "employees inspected his work, and that an onsite

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 18

1  [railroad employee] coordinated his locations and schedules for work

2  assignments." *Id.*

3      Some facts here, including that AAT hired, trained, and dispatched

4  Mr. LaDue to worksites, and provided him safety training and equipment, are

5  identical to those in *Royal*. However, present here is evidence of KFR's actual

6  control over Mr. LaDue. Plaintiffs present evidence that OmniTRAX and KFR

7  directed Mr. LaDue's daily activities through morning briefings, task lists, and on-

8  the-job supervision. Plaintiffs present evidence that OmniTRAX and KFR's

9  control over Mr. LaDue went so far as to override AAT's instruction against

10  traveling in the dark. Such evidence is offered and contested through competing

11  deposition testimony. The Court may not make credibility determinations or

12  weigh competing testimony, *Anderson*, 477 U.S. at 255, and must make all

13  inferences in Plaintiffs' favor. *Rookaird*, 908 F.3d at 459.

14      Defendants' control rises above a mere "obligation to conform to [mutually

15  agreed upon] safety requirements" or "cooperation necessary to carry out a

16  coordinated undertaking[,]" which were all that the plaintiff in *Royal* could show.

17  857 F.3d at 763-64. Defendants also offer unreported out-of-jurisdiction district

18  court cases for comparison. While not controlling, the facts of these cases further

19  demonstrate why summary judgment is appropriate here. Plaintiffs' showing here

20  goes well beyond that of the plaintiff in *Thomas*, where the Western District of

Arkansas was presented with little more than self-serving statements demonstrating only that the defendant railroad conducted daily briefings and demanded that incorrect work be repaired. 2018 WL 3747467, at *4-5. Plaintiffs surpass the plaintiff's showing in *Mattingly*, who "chose where he wanted to work every morning[,]" was not subject to railroad supervision outside of inspection of the work performed, and failed to point to "specific orders of [railroad] supervisors instructing him on the details of his own physical work . . . ." No. 19-cv-00170, 2022 WL 3356011, at *14 (E.D. Ky. Aug. 12, 2022). Further, the *Mattingly* plaintiff did not show that the railroad "was exercising control, nor had the right to, at the time of [the plaintiff's] injury." *Id.* at *16.

## CONCLUSION

Plaintiffs have presented a genuine dispute of fact from which a reasonable jury could conclude that Mr. LaDue was employed by Defendants under FELA. Therefore, the Court denies summary judgment.

Accordingly, **IT IS HEREBY ORDERED:**

1.  The Defendants' Motion for Summary Judgment, **ECF No. 67**, is **DENIED**.

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and provide copies to the parties.

DATED November 18, 2022.

<u>s/Mary K. Dimke</u>
MARY K. DIMKE
UNITED STATES DISTRICT JUDGE